**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MICHAEL GOLDEN & | § | |
| CATHLEEN GOLDEN, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-817 |
| | § | |
| AUSTIN COUNTY SHERIFF'S | § | |
| DEPARTMENT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

This case arises out of Michael Golden's February 1, 2007 encounter with Austin County, Texas sheriff's deputies and his subsequent overnight detention. Golden and his wife sued the Sheriff's Department and the individual deputies, David Moseley and Charles Culp, asserting claims for violations of his federal rights under 42 U.S.C. § 1983 and state law claims under the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE § 101.001 *et seq.* The defendants have moved to for dismissal and summary judgment. (Docket Entry No. 63). Based on careful review of the motion and response, the parties' submissions, the record, and the applicable law, this court grants the defendants' motion in part and denies it in part. The reasons for this ruling are stated below.

## I.     Background

Austin County Sheriff's Deputies David Moseley and Charles Culp spent the evening of February 1, 2007 patrolling Interstate 10 west of Sealy, Texas. They were in a marked patrol car.

Michael Golden, who lives in Auburn, Alabama, was driving down that stretch of Interstate 10 shortly before 9:00 p.m., on his way to San Antonio.  The deputies clocked Golden's car at over 80 miles per hour near mile marker 714.  The speed limit was 65 miles per hour.  Moseley, who was driving the car, began pursuing Golden's car.  Just past mile marker 713, Moseley activated the patrol car's emergency lights, but Golden did not stop.  The patrol car's video camera, which automatically begins recording when the emergency lights are activated, started recording at 20:52:03.  (*Id.*, Ex. A-1).  At 20:52:55, Moseley briefly pulled alongside Golden's car and shone a spotlight at the driver's seat.  Moseley states in the affidavit he filed in this case that Golden looked at him but kept on driving.  (*Id.*, Ex. A, ¶ 9).  Moseley also continued to drive, maintaining his position behind Golden, while sounding the patrol car siren and keeping the spotlight trained on Golden.  (*Id.*, Ex. A-1).  At 20:53:58 on the recording, Golden signaled a lane change.  He passed a van and returned to the right lane immediately afterward.  (*Id.*).  Golden exited the hightway at exit 709 and stopped at the stop sign at the end of the exit ramp, then accelerated and continued driving.  (*Id.*).  On the recording, one of the deputies can be heard over the siren saying, "Nope, he ain't getting out," as Golden  began to accelerate.  After radioing for help, one of the deputies says, "Watch for a gun."  The other replied, "Oh, yeah. I'm unbuckling, baby."  Shortly afterward, at 20:55:25 on the recording, Golden's car pulled off onto the shoulder and slowed to a stop, nearly two and a half minutes after the officers activated their lights and nearly a minute after briefly stopping at the stop sign.

Both deputies jumped out of the patrol car with their guns drawn, shouting, "Get out of the vehicle!"  (*Id.*).  Golden opened the door.  As he did so, the deputies began to yell at him to "get on the ground."  (*Id.*).  In their affidavits, the deputies characterize Golden as "slow" in getting out of

the vehicle, (*Id.*, Ex. A., ¶ 16 & Ex. B, ¶ 8).  The video recording shows that Golden opened his door

within four seconds of the first order to get out.  Within seven seconds after the door opened, Golden

lowered himself to the ground, crouching on his hands and knees with his face down.  (*Id.*, Ex. A-1).

At that point, Culp walked behind Golden.  Culp and Moseley began to push Golden flat onto the

ground.  (*Id.*).  Golden started to yell at the officers, who then began yelling, "Put your hands behind

your back!"  (*Id.*).  Golden continued to yell at the officers about why he should not be arrested.  As

he yelled, he lifted his right arm behind his back, supporting himself with his right arm.  (*Id.*).  Culp

appears to reach for his pepper spray.  (*Id.*).  He shook the spray, reached around toward Golden's

face, and appears to have sprayed it.  Golden's yelling switched from screaming reasons why he

should not be arrested to cries of "You asshole!"  Ten seconds elapsed between when Golden first

got on the ground and when Culp reached for his mace.  (*Id.*).  Five seconds later, after shaking the

mace, Culp reached in front of Golden and apparently sprayed him in the face.  Golden began

coughing.  Culp briefly stepped away.  Golden started to raise up but quickly lowered himself back

to the ground as Culp approached him again.  Just as Golden put his other hand behind his back,

Culp  approached, reached around toward his face, and appeared to spray him again, about six

seconds after first spraying him.  At 20:56:15 on the tape, Culp reached toward Golden's face and

appears to spray Golden again, a third time.  At this point, Golden still had both hands behind his

back. (*Id.*).  At 20:56:58 on the tape, Culp asked for a "medic for decontamination." (*Id.*).

     The officers began to search Golden's car.  At 20:57:28 on the tape, Moseley asked Golden

why he had not stopped when the patrol car lights went on.  (*Id.*).  Golden responded by yelling,

"I'm not running from you.  I don't pull off on the [expletive] interstate.  You ever watch?  People

get killed!  I do not pull off on the [expletive] interstate!"  Golden continued to yell at the deputies,

saying that he would sue them and that they used "excessive force."  (*Id.*).  The deputies pushed Golden toward the ground and told him to stay quiet.  Golden remained quiet until he started to cough.  (*Id.*).  He then said to the officers, "You'd better hope I don't die," to which Moseley responded, "We've got you some medical help coming, sir."  (*Id.*). The video appears to show deputies flooding Golden's eyes with water to reduce the pain from the pepper spray during the search of the car.  (*Id.*).  The deputies apparently discovered a gun with a lock on it at 21:00:26, on the video recording.   Culp can be heard saying, "That's why I said watch for a gun."  (*Id.*).

After searching Golden's car, the deputies took him to the Austin County jail, where he spent the night.  Golden alleges that the workers at the jail ignored his medical needs, which included complications from a preexisting condition — a brain tumor — and the pepper spray.  Golden was released the next day.  He alleges that some of his personal property, including the key to his gun lock and a bag of ammunition, was not returned.

The Goldens sued the Austin County Sheriff's Office, Austin County Sheriff R. Dewayne Burger, Austin County Judge Carolyn Bilski, and unidentified police officers in Texas state court on January 30, 2009.  (Docket Entry No. 1, Ex. 3, Plaintiffs' Original Petition, at 3).  Austin County removed the case to this court in March 2009, (Docket Entry No. 1), and the Goldens amended their complaint in July 2009, (Docket Entry No. 34).  The amended complaint names Austin County, Sheriff Burger, and Deputies Charles Culp, Chris Herreth, and Harry Moseley .  (*Id.*).  The Goldens agreed to dismiss Sheriff Burger from the suit, (Docket Entries No. 52, 54).  The complaint asserts federal causes of action under § 1983 and state law claims under the Texas Tort Claims Act, TEX. CIV. PRAC. & REM. CODE § 101.001 *et seq.*  His wife, Cathleen Golden, also seeks damages.

## II.    The Applicable Legal Standards

4

### A.      Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b) (6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  *Twombly* rejected the Supreme Court's prior statement in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *See Twombly*, 550 U.S. at 562–63.  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  Under Rule 8(a)(2), plaintiffs are not required to include "'detailed factual allegations,' but more than 'an unadorned, the-defendant-unlawfully-harmed-me accusation' is needed." *Id.* (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 129 S. Ct. at 1949). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305,

329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) (unpublished) (per curiam) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir.1999))).

### B.    Rule 56

#### 1.    The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### 2.   The Summary Judgment Evidence

The defendants offer the following evidence in support of their motion:

(1) an affidavit from Deputy Moseley;

(2) video footage from the patrol car of the traffic stop;

(3) Austin County Sheriff's Office Policy No. 5.01, which governs the use of force;

(4) Austin County Sheriff's Office Policy No. 4.06, which governs the search of motor vehicles;

(5) an affidavit from Deputy Culp;

(6) the incident report and related paperwork from Golden's arrest;

(7) a video of the vehicle pursuit route during the day; and

(8) excerpts from Golden's deposition.

In response, the Goldens supplied medical records from three doctors.

The Goldens have moved to strike various statements in the defendants' summary judgment motion and the supporting materials. The motion to strike the statements in the motion argues that these statements list "facts" that the Goldens assert are disputed. This argument goes to the merits of the motion and does not identify a basis to strike the statements. The motion to strike certain statements from the deputies' affidavits and other materials is denied as moot. This court's decision to dismiss all claims other than the excessive force claims against the Culp and Moseley did not involve consideration of any of the contested evidence. Instead, it resulted from the Goldens' failure either to plead sufficient facts to entitle them to relief or to meet their summary-judgment burden of production.

## III.    Analysis

### A.    The Claims Against Culp, Herreth, and Moseley

#### 1.    Section 1983

The individual defendants have asserted qualified immunity and have moved for summary judgment dismissing the § 1983 claims on that basis. The record contains no evidence as to any use of excessive force by Herreth. The claims against him are dismissed with prejudice.

Qualified immunity  shields government officials "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Fraire v. Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Wilson v. Layne*, 526 U.S. 603, 614 (1999).  The rule's purpose is to "strike a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses." *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 879 (5th Cir. 2004). Evaluating qualified immunity traditionally involves a two-step sequence. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  One step is to consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Hernandez*, 380 F.3d at 879.  The second step is to determine whether the defendant's actions were "objectively reasonable in light of clearly established law at the time of the incident." *Id.*  More recently, the Supreme Court held that the court may dismiss based on step two without evaluating step one. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

The individual defendants first move for summary judgment dismissing the claim that they violated the Goldens' constitutional rights by ordering them to stop and by arresting Golden.  An officer may make an arrest without a warrant when he has probable cause to believe that someone is committing a crime in his presence, even if the crime is a misdemeanor traffic offense. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (dismissing federal civil rights claims arising from an arrest for failing to fasten children in seat belts, driving without a license, and failing to provide proof of insurance, each punishable by a fine of under $50).  "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest

are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1995)) (emphasis removed).  The evidence is undisputed that the deputies clocked Golden driving at a far higher rate of speed than the 65 mile an hour speed limit.  The evidence is also undisputed that the officers tried to get Golden to stop using the well-recognized commands of turning on their lights and then the siren.  There is also uncontroverted evidence in the record that Golden looked directly at the deputy who was shining a spotlight on Golden.  Despite all these signals, Golden nonetheless failed to stop.  *See* TEX. PENAL CODE § 38.04 ("A person commits an offense if he intentionally flees from a person he knows is a peace officer attempting to lawfuly arrest or detain him."); TEX. TRANSP. CODE § 545.421 ("A person commits an offense if the person operates a motor vehicle and wilfully fails or refuses to bring the vehicle to a stop or flees, or attempts to elude, a pursuing police vehicle when given a visual or audible signal to bring the vehicle to a stop.").  As a matter of law, the deputies had probable cause to stop and arrest Golden.

Summary judgment is not, however, appropriate on the excessive-force claim.  Golden has raised disputed fact issues material to determining whether the "officers' actions were clearly unreasonable, in light of clearly-established law at the time, and in light of the information the officer[] possessed."  *Wagner v. Bay City, Tex.*, 227 F.3d 316, 321 (5th Cir. 2000).

To state a claim for unconstitutionally excessive force, a plaintiff must allege: (1) an injury; which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.  *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000); *Ikerd v. Blair,* 101 F.3d 430, 433 (5th Cir. 1996).  Excessive-force

10

determinations do not involve "easy-to-apply legal test[s]." *Scott v. Harris*, 550 U.S. 372, 383–84 (2007) (rejecting a bright line between lethal and nonlethal force).  The Supreme Court has described the inquiry as a "slosh . . . through the factbound morass of 'reasonableness.'"  *Id.* at 383. Despite the indeterminacy of the doctrine, several key principles guide the inquiry.  An excessive-force inquiry is not a vehicle for second-guessing officers' conduct in hindsight. *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (citing *Graham v. Conner*, 490 U.S. 386, 396–97 (1989)). Courts must consider only what the information available to the officers at the time.  *Id.*  Courts must also recognize that officers often must make split-second decisions in stressful situations.  *Id.* Finally, officers cannot be personally liable unless the law at the time clearly established that the use of force was unreasonable.  *Id.*

There are two distinct inquiries when analyzing an excessive force claim.  One is a fact issue, which can preclude summary judgment; the other is a legal issue, which cannot.  Whether a given course of conduct is constitutionally unreasonable is a legal question, but whether that course of conduct actually happened is a fact question .  *Kinney v. Weaver*, 367F.3d 337, 346 (5th Cir. 2004) (en banc).  Summary judgment is not appropriate in this case because there are genuine issues of disputed fact material to determining whether, when Golden was sprayed with the pepper spray, he was resisting the officers, and whether any such resistance continued as he was sprayed more than once.  If Golden was offering no resistance or quickly ceased any resistance, using or continuing to use pepper spray was excessive.

The summary-judgment analysis in this case is somewhat different from the usual case, in which a disagreement over material facts between plaintiff and defendant will ordinarily preclude summary judgment.  The evidence includes a video tape, and the parties have not contested its

accuracy.  When such a tape exists, a court must not defer to a party's version of events if it is "blatantly  contradicted by [the footage], so that no reasonable jury could believe it," and rule against that party at summary judgment.  *Scott*, 550 U.S. at 378, 380 (2007).  As the Supreme Court has stated, when a party's "version of events is so utterly discredited by the record that not reasonable jury could have believed him," a court should not rely "on such visible fiction."  *Id.* at 380–81.

In this case, the parties agree about several aspects of the events leading up to the deputies' use of pepper spray.  They agree that Golden was speeding, that he did not pull over when the officers activated their lights and siren, and that there are many places where he could have pulled over earlier than he did.  But they disagree about key facts.  The officers characterize Golden's behavior as dangerous and indicative of an intent to flee once stopped.  Golden characterizes his delay in stopping as based solely on his fear for his and his wife's safety if they pulled over while still on the highway, not as indicating any intent to flee once he did stop.  Even if the deputies have presented evidence supporting their argument that Golden's initial refusal to stop when ordered and his continued driving down the highway and past the stop sign gave them reason to believe that he might attempt to flee, that does not resolve the remaining disputed facts that are material to determining excessive force and qualified immunity.

The deputies assert that once Golden stopped, he refused at first to follow their orders and physically and verbally resisted arrest.  In particular, the officers assert that Golden was "slow" to exit the vehicle when ordered to, initially refused to get on the ground as instructed, "reared his back up" when Culp tried to push him to the ground, and refused to stay on the ground once he was down.  Golden disputes these assertions.  He insists that once he stopped the car, he promptly and

12

completely complied with the orders he received.  He emphasizes that he did not start yelling at the deputies until they initiated physical contact.  The parties also dispute the extent of the force the deputies used.  Specifically, the parties dispute the number of times Culp sprayed Golden toward his face.  Golden asserts that he was sprayed three times and that the third time was well after he was flat on the ground with his hands behind him.  Culp asserts that he does not know how many times the spray actually discharged, but he thinks it was only two.

The tape does not settle these disputes.  It is clear that Golden failed to stop when the patrol car lights and sirens went on, but it is also clear that he was driving safely.  He used his turn signal before changing lanes to pass a car and stopped at the only stop sign he encountered.  The tape also provides a basis for a jury to conclude that his behavior once he stopped indicated little risk of flight or confrontation.  Golden made no sudden moves, either to get out of his car before the deputies ordered him to do so, or to make any hasty movements once he began to exit.  The video shows Golden getting on the ground promptly in response to the deputies' command to do so.  Golden lowered himself to his hands and knees with his head down.  Instead of giving any further instructions, Culp began to push Golden down.  That was the first point at which Golden began to yell that he was a retired Air Force officer.  As soon as the deputies ordered Golden to put his hands behind his back, he raised his right hand and put it behind his back.  At that point, the deputies had not told Golden that he needed to lie flat on the ground instead of on all fours.  A jury could reasonably conclude that he did not leave his other hand on the ground to disobey the officers but instead to avoid falling face-first on the ground.  A jury could conclude that there was no reason for Culp to reach for his pepper spray instead of his handcuffs when Golden placed his right hand behind his back.  And a jury could conclude that once Golden was sprayed and had put his other

13

hand behind his back, and was lying flat on the ground, with Moseley nearby pointing his firearm at Golden's head, it was excessive to spray him a second and perhaps a third time.

If the jury resolved the disputed fact issues by concluding that Golden complied with all of the deputies' commands with reasonable promptness once he stopped his car, a jury could conclude that the deputies' use of the mace, particularly more than once, violated a clearly established right. Even though officers are entitled to use some force to arrest a suspect, *Graham*, 490 U.S. at 394–95, no reasonable officer would believe that using pepper three times on a compliant suspect who was lying flat on the ground with one, then two, hands behind his back, with a weapon trained on that suspect, was reasonable. The cases clearly establish that an officer cannot use pepper spray on a suspect who is not resisting the officer. *See Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else. Courts have consistently concluded that using pepper spray is reasonable, however, where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." (footnotes omitted)); *Wagner*, 227 F.3d at 324 (observing "that nothing about the use of chemical spray . . . was objectively unreasonable conduct where the suspect physically resisted arrest. The officers' actions were all consistent with the idea that they merely were trying to restrain a violent individual."). As one court has stated, using pepper spray "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon . . . constitutes excessive force." *LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000). Courts have consistently held that it is

14

unreasonable to use pepper spray when a suspect is not resisting or is no longer resisting. *See, e.g.*, *Adams v. Metiva*, 31 F.3d 375, 384–87 (6th Cir. 2004) (finding that a police officer who repeatedly sprayed mace in the face of an unarmed plaintiff who was not resisting and was not subject to lawful arrest would be liable for excessive force as a matter of law).

The Sixth Circuit's decision in *Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763 (6th Cir. 2004), in which the court concluded that use of pepper spray was appropriate, is instructive because of the differences from this case. The plaintiff, Gaddis, was driving slowly but erratically, suggesting that he was drunk, when an officer turned his lights on and honked his horn at him. *Id.* at 766. Gaddis continued to drive away. *Id.* Gaddis came to a stop at a light, but when the officer approached on foot, Gaddis turned right and continued driving. *Id.* A block later, the officer was able to get Gaddis to stop. *Id.* After asking for Gaddis's license, the officer told Gaddis to get out of the car. *Id.* at 766–67. Gaddis did so, his hands in his pockets. *Id.* at 767. The officer pulled him by the collar away from the car. *Id.* As he did so, Gaddis swiftly pulled a knife out of his pocket. A two-minute standoff occurred, during which Gaddis said that he wanted to leave and and talked about an imaginary past physical altercation with the officer. *Id.* The court held that pepper spray was a reasonable use of force:

> At the time [the officer] acted, the officers had probable cause to suspect Gaddis of two crimes that were also moderate in severity: driving while intoxicated, a misdemeanor for first offenders under Michigan law, and fleeing an officer. While Gaddis arguably did not pose an immediate threat to the officers' safety as he stood next to his car brandishing a knife (since the officers were able to keep their distance), Bain could have reasonably concluded from Gaddis's erratic driving and behavior that he would pose a danger to other motorists if allowed to flee. Gaddis had announced his desire to leave the scene, and this statement prompted Bain to spray him. That fact is also relevant to the final Graham factor, namely whether the suspect was resisting arrest. Gaddis's remarks indicated an intent to

> continue evading arrest, and his brandishing of a knife was
> reasonably interpreted as a sign of intent to resist, perhaps violently.

*Id.* at 774–75 (footnotes omitted).

The summary-judgment facts in this case are significantly different.  The only similarity is the initial offense: refusing to pull over for an officer and a traffic offense.  The similarities end there.  Gaddis had a deadly weapon and acted in a way that reasonably caused officers to think he would use it.  Based on the current record, a jury in this case could find that Golden was cooperative after pulling over and that his behavior presented no basis for the officers to conclude at that point that he intended either flight or resistance.  In *Gaddis*, by contrast, the officer did not use force until two minutes after Gaddis — who was drunk and appeared irrational — brandished a knife and made it increasingly clear that he was a threat to officer safety.

The fact that Golden's injuries are relatively mild and fleeting does not require granting summary judgment.  Before the Supreme Court's decision in *Hudson v. McMillan*, 503 U.S. 1 (1992), the Fifth Circuit required a "serious injury" to satisfy the injury prong.  *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).  *Hudson* held that "[t]he absence of serious injury is . . . relevant to the Eighth Amendment inquiry, but does not end it."  503 U.S. at 7.  The Fifth Circuit has applied *Hudson* to Fourth Amendment excessive-force cases.  *Williams*, 180 F.3d at 703.  "An injury is generally legally cognizable when it results from a force that is constitutionally impermissible—that is, objectively unreasonable under the circumstances."  *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir. 2010) (quoting *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)) (alterations omitted).  The  same injury may be sufficient to preclude summary judgment in one case but insufficient in another.  *See Williams*, 180 F.3d at 704 ("fleeting dizziness, temporary loss of breath, and coughing" was insufficient injury in the light of a permissible, but invasive, search, but sufficient for contact

16

"motivated entirely by malice"), *clarified on reh'g by* 186 F.3d 633, 634 (noting that the reference to malice was "meant to call attention not to his subjective intent but instead the absence of anny valid reason for him to continue physical contact with Williams"). Godlen has provided medical records reporting that he had "[r]edness in [right] eye, bruising in Both hands due to handcuffs, [and] difficulty Breath[ing]," (Docket Entry No. 63, Ex. I), an outbreak of herpes zoster, (*Id.*, Ex. J), and post-traumatic stress disorder, (*Id.*, Ex. K). The nature and extent of the injuries is not in itself sufficient to grant summary judgment that the force was reasonable in relation to the need.

The remaining claims, however, must be dismissed. Golden cannot assert or raise a fact issue on his claim for an illegal search of his car. After a lawful arrest, law enforcement may perform an inventory search before impounding a vehicle. *United States v. Foots*, 340 F. App'x 969, 971 (5th Cir. 2009) (citing *United States v. Andrews*, 22 F.3d 1328, 1333–34 (5th Cir. 1994)). Nor can Golden pursue a claim under the Second Amendment for removing his gun. "It is not illegal . . . for a police officer to seize an arrestee's weapon if the officer is making a custodial arrest . . . ." *Hunter v. City of Electra, Tex.*, Civ. A. No. 7:03-CV-153-R, 2006 WL 1814150, at *7 (N.D. Tex. June 29, 2006). And Golden has no Sixth Amendment claim for the deputies' alleged failure to tell him why he was being arrested. The Sixth Amendment right to be informed of the nature and cause of the accusation relates to the procedure for informing a defendant who will stand trial, but it is not a requirement at arrest. *See Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) ("A defendant's right to be informed of the nature and cause of an accusation brought against him does not exist until the Government is committed to a prosecution.") (citing *Kladis v. Brezek*, 823 F.2d 1014, 1018 (7th Cir. 1987). Golden has not alleged or raised a fact issue as to a violation of his right to medical care when in confinement relating to the individual defendants. Golden names no

individuals responsible for the allegedly inadequate care he received, and there is no evidence tying the named individual deputies to the medical care he received — or did not receive — in jail.

### B.      The Claims Against Austin County

Excessive force is the only rights violation that has survived summary judgment. Respondeat superior does not furnish a basis to hold a county liable under § 1983.  *Valle v. City of Houston*, 613 F.3d 536, 541 (5th Cir. 2010).  To show liability for a violation of a federal right committed by an employee or agent, a  plaintiff must satisfy three elements: (1) a custom or policy (2) attributable to a policymaker (3) that was the "moving force" behind the alleged rights violation. *Id.* at 541–42.  A custom or policy is not the "moving force" behind a civil rights violation unless the policymaker was deliberately indifferent to the risk of the violation that occurred.  *Id.* at 542 (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 411 (1997)).  "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.'"  *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).  Prior alleged violations showing the policymaker to be deliberately indifferent must be similar to the alleged violation at issue.  *See Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) ("Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question.  That is, notice of a pattern of similar violations is required.") (footnotes omitted).  To survive a motion to dismiss, "[t]he description of the policy or custom and its relationship to the underlying constitutional violation . . . must not be conclusory; it must contain specific facts."  *Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997).

There are no allegations of an illegal custom or policy in the complaint, and the policies in

the summary judgment record are not themselves unconstitutional.  There is no evidence of a pattern of prior similar incidents or a policy so obviously deficient that that its existence shows deliberate indifference.  *Valle*, 613 F.3d at 547–49  The § 1983 claim against Austin County is dismissed.

Austin County is the only remaining defendant on the state-law claims.  (*See* Docket Entry No. 32, pp. 8–11).  It argues that the state-law claims should be dismissed for lack of jurisdiction because the Goldens' allegations do not fit within the TTCA's waiver of Eleventh Amendment immunity.  Courts in the Fifth Circuit use a six-factor test to determine whether there is a waiver of immunity:

> (1) whether the state statutes and case law characterize the agency as an arm of the state;

> (2) the source of funds for the entity;

> (3) the degree of local autonomy the entity enjoys;

> (4) whether the entity is concerned primarily with local, as opposed to statewide, problems;

> (5) whether the entity has authority to sue and be sued in its own name;

> (6) whether the entity has the right to hold and use property.

*Delahoussaye v. City of New Iberia*, 937 F.2d 144, 147 (5th Cir. 1991) (citing *Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 131 (5th Cir. 1986); *see also  United Disaster Response, LLC v. Omni Pinnacle, LLC*, 511 F.3d 476, 479 (5th Cir. 2007) (considering whether Louisiana's parishes are arms of the state under the *Delahoussaye* factors).  Under these factors, Texas counties are not ordinarily arms of the state for the purposes of Eleventh Amendment immunity.  *Crane v. State of Texas*, 759 F.2d 412, 416–17 (5th Cir. 2005) (citing "an abundance of authority holding the Eleventh Amendment inapplicable to counties of particular states").  There is an exception if "the relief

19

granted would run directly against the state." *Id.* at 417 (citing *Pennhurst*, 465 U.S. at 123 n.34 (1984)). Austin County has not suggested that relief would run against the state in this case.

Nevertheless, dismissal is appropriate under Rule 12(b)(6)because the complaint does not state a claim under the TTCA. First, no governmental entity can be held liable for the acts of an state officer if official immunity would defeat liability for that officer. *DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995). Official immunity under Texas law is "substantially the same as federal qualified immunity law." *Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997). In addition, government entities are not ordinarily liable for emotional distress unaccompanied by some other damage. *City of Tyler v. Likes*, 962 S.W.2d 489, 500 (Tex. 1993). Third, there is no liability for intentional torts under the TTCA. TEX. CIV. PRAC. & REM. CODE § 101.057(2); *Torres v. County of Webb*, 150 F. App'x 286, 290 (5th Cir. 2005). Fourth, the waiver applies only to governmental action in one of three general areas, the 'use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property.'" *County of Cameron v. Brown*, 80 S.W.3d 549, 553 (Tex. 2002) (quoting *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 611 (Tex. 2000)) (quotation marks omitted).

Golden's loss of real property claims are based on his incarceration. This court has already held that his arrest was lawful and there is no allegation that the individual defendants had any involvement with him during his time in the cell. "Because a jail cell that confines its occupant is operating as intended, its use to confine a person lacks the required causal nexus if the cell merely provides the condition that made a personal injury possible." *Hardin County Sheriff's Dep't v. Smith*, 290 S.W.3d 550, 553 (Tex. App.—Beaumont 2009) (citing *Ordonez v. El Paso County*, 224 S.W.3d 240, 244 (Tex. App.—El Paso 2005). Golden does not claim that the cell itself injured him.

20

None of Golden's claims for negligent use of a patrol car are actionable.  He alleges that by shining the spotlight into his window was "blinding."  That claim fails  because using a spotlight in a patrol car to indicate to a driver that he is the target of a traffic stop and must pull over is not so unreasonable to lose the deputies' official immunity or state a claim under the TTCA.  *Cf. Tex. Dep't of Public Safety v. Petta*, 44 S.W.3d 575, 579 (Tex. 2001) ("A police officer is privileged to use force to the degree he reasonably believes is necessary to make an arrest, taking care that the force used is commensurate with the necessity.").

Golden's claims based on negligent use of personal property fail because he alleges intentional torts, not negligence. *Id.* at 580 ("Here, the conduct Petta complains of is the same conduct that forms the basis of her assault and battery claim against Rivera. The specific conduct-hitting the window, calling a tow truck, aiming the gun, blocking Petta in with the cruiser, and firing at Petta's tires-is clearly intentional. The allegations fit squarely within [the] exclusion of claims arising out of assault, battery, and false imprisonment.").

Because this court has dismissed Golden's state-law claims, it must also dismiss those of his wife, because any damages to her stem from her husband's injuries.  *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 646 (Tex. 2009) (noting that "lost consortium claims [are] derivative in the sense that" a plaintiff must establishing that the defendant is liable to for the injuries to the person whose consortium is lost).

## IV.  Attorney's fees

Both sides have moved for attorney fees.  Because disputed fact issues and the § 1983 remain, the issue of fees is premature.

21

**V.     Conclusion**

The defendants' motion for summary judgment is denied as to the claims against deputies Culp and Moseley for excessive force under § 1983 and otherwise granted.  A scheduling conference is set for **November 12, 2010**, at 8:30 a.m. in Courtroom 11-B.

SIGNED on September 30, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

22